Filed 4/23/14 Opinion after rehearing

*CERTIFIED FOR PUBLICATION*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| CONSUMER WATCHDOG et al., | B232338 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BS121397) |
| v. | |
| DEPARTMENT OF MANAGED HEALTH CARE et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Robert H. O'Brien and James C. Chalfant, Judges. Judgment is affirmed in part and reversed in part and modified.

Consumer Watchdog, Harvey Rosenfield, Pamela M. Pressley and Jerry Flanagan; Strumwasser & Woocher, Fredric D. Woocher, Beverly Grossman and Byron F. Kahr for Plaintiffs and Appellants.

Law Office of Stephen P. Sommers, Stephen P. Sommers and Una Lee Jost as Amicus Curiae for California Association for Behavior Analysis on behalf of Consumer Watchdog.

Autism Speaks and Daniel R. Unumb; Kaye Scholer and Robert Barnes for Autism Speaks and Autism Deserves Equal Coverage as Amicus Curiae on behalf of Plaintiffs and Appellants.

California Department of Managed Health Care, Holly Pearson, General Counsel, Debra L. Denton, Assistant Chief Counsel and Drew A. Brereton, Senior Counsel; Attorney General of California, Kamala D. Harris, Attorney General, Julie Wend-Gutierrez, Senior Assistant Attorney General, Leslie P. McElroy, Supervising Deputy Attorney General and Carmen D. Snuggs, Deputy Attorney General.

Department of Insurance, Dave Jones, Insurance Commissioner and Patricia Sturdevant, Deputy Commissioner & Health Enforcement Advisor as Amicus Curiae upon the request of the Court of Appeal.

---

Applied Behavioral Analysis (ABA) is an intensive form of therapy which has had documented success in treating the symptoms of autism in young children. While ABA can be performed by a licensed physician or psychologist, it is often performed, or supervised, by an individual certified by the private Behavior Analyst Certification Board (BACB). The issue raised by this case is whether the Department of Managed Health Care (DMHC) is required, by law, to direct health plans within its jurisdiction to provide coverage for ABA when provided, or supervised, by BACB-certified therapists who are not otherwise licensed. DMHC contends that it may require plans to cover ABA therapy *only* when it is provided by someone licensed to practice medicine or psychology. Plaintiff, Consumer Watchdog,[1] argues that non-licensed, but BACB-certified, ABA therapists[2] are, in fact, recognized by the medical community as proper providers and supervisors of ABA therapy. Thus, their services should be covered by the plans. Consumer Watchdog sought a writ of mandate directing DMHC to respond to plan member grievances challenging a denial of coverage for ABA therapy provided by a BACB-certified therapist by ordering the plan to cover such therapy. The trial court denied the petition.

We conclude that a statute recently enacted by the Legislature authorizes BACB-certified providers to perform ABA therapy under state licensing laws and, therefore, DMHC can no longer uphold a plan's denial of coverage on the basis that a BACB-certified provider is not licensed. We also hold that the trial court correctly resolved Consumer Watchdog's challenge to a DMHC policy as violative of the Administrative

---

[1] There is an individual plaintiff in this case as well, Anshu Batra, M.D. As Dr. Batra's arguments are not distinct from those made by Consumer Watchdog, references to Consumer Watchdog include Dr. Batra.

[2] Some BACB-certified providers are also licensed to practice medicine or psychology; there is no dispute that DMHC requires plans to cover therapy provided by such otherwise-licensed BACB-certified providers. Therefore, for the remainder of this opinion, when we refer to BACB-certified providers, we are referring to those BACB-certified providers who are not otherwise licensed to practice medicine or psychology.

Procedures Act.  The judgment is reversed in part and modified to enjoin DMHC from upholding a plan's denial of ABA services where the basis for the denial is that a BACB-certified provider is not licensed.  In all other respects the judgment is affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND

In addition to discussing the factual and procedural background of the instant litigation, we also consider the relevant legislative framework.  Additionally, we discuss statutory developments which occurred after the trial court issued its judgment.

1.      *Autism and ABA*

"According to a 2007 report of the California Legislative Blue Ribbon Commission on Autism, '[a]utism spectrum disorders are complex neurological disorders of development that onset in early childhood.'  [Citation.]  These disorders, which include full spectrum autism, 'affect the functioning of the brain to cause mild to severe difficulties, including language delays, communication problems, limited social skills, and repetitive and other unusual behaviors.'  [Citation.]  Nationally, autism spectrum disorders affect an estimated one in every 150 children across all racial, ethnic, and socioeconomic backgrounds.  [Citation.]" (*Arce v. Kaiser Foundation Health Plan, Inc.* (2010) 181 Cal.App.4th 471, 478, fn. omitted.)  Amici Curiae Autism Speaks and Autism Deserves Equal Coverage represent that, under more current data, the prevalence rate for autism is approximately 1 in every 88 children.

ABA is a form of behavioral health treatment which develops or restores, to the maximum extent practicable, the functioning of an individual with autism.  (Health & Saf. Code, § 1374.73, subd. (c)(1).)  Numerous studies indicate that ABA is the most effective treatment known for autistic children.  Studies also demonstrate that ABA has lasting results.  Autism is understood to be a brain-based neurological disorder.  ABA therapy can create new brain connections in a child with autism; these new connections are to be contrasted with the abnormal connections caused by autism.  Neither party in this case disputes that ABA is an effective medical treatment for many young autistic children.

4

ABA is a time-intensive treatment.  It is often prescribed for 26 to 40 hours per week.  While there can be no doubt that the treatment plan for providing ABA to any autistic child must be established, modified, and supervised by a qualified expert in ABA, the evidence in this case indicates that the actual delivery of services to the child may be performed by a non-expert.  A publication by the BACB suggests that a front-line behavioral technician need only be a high school graduate, who has subsequently received training in basic ABA procedures and demonstrated competency.  (BACB, Guidelines:  Health Plan coverage of Applied Behavior Analysis Treatment for Autism Spectrum Disorder (ver. 1.1, 2012) p. 27.)  It appears that ABA, and similar behavior therapies, are somewhat unique among medical treatments in this respect.  While the treatment plan must be created, modified, and supervised by a professional, a paraprofessional may actually deliver the services.

The field of ABA is relatively new.  The landmark study often cited as the first to establish the effectiveness of ABA in autistic children was published in 1987. (O. Ivar Lovaas, *Behavioral Treatment and Normal Educational and Intellectual Functioning in Young Autistic Children*, 55 J. Consult. Clin. Psychol. 3 (1987).)  The BACB, a private organization established to grant national credentials to ABA professionals (not front-line providers), was established in 1998. (<http://www.bacb.com/index.php?page=1> [as of April 23, 2014].)  When health plan members first sought coverage for ABA, plan denials were upheld on the basis that ABA was experimental.  Independent medical review[3] panels did not uniformly recognize ABA as a medically necessary treatment until 2007.

The BACB has three levels of certification:  (1) Board Certified Behavior Analyst (requires a Master's degree in a related field, 225 hours of graduate coursework in behavior analysis, substantial supervised experience, and passing an examination); (2) Board Certified Behavior Assistant Analyst (requires a Bachelor's degree, 135 hours undergraduate or graduate coursework in behavior analysis, a lesser amount of

---

[3]    We discuss the independent medical review process later in this opinion.

5

supervised experience, and passing an examination); and (3) Board Certified Behavior Analyst-Doctoral (requires a Board Certified Behavior Analyst certification and a doctorate degree in a related field).

        2.      *The Knox-Keene Act and Mental Health Parity Act*

In 1975, the Legislature enacted the Knox-Keene Health Care Service Plan Act of 1975, informally known as the Knox-Keene Act (Knox-Keene). (Health & Saf. Code, § 1340.) Under Knox-Keene, DMHC "has charge of the execution of the laws of this state relating to health care service plans and the health care service plan business including, but not limited to, those laws directing the department to ensure that health care service plans provide enrollees with access to quality health care services and protect and promote the interests of enrollees." (Health & Saf. Code, § 1341, subd. (a).)

Knox-Keene directs plans to provide all "basic health care services" to their subscribers and enrollees. (Health & Saf. Code, § 1367, subd. (i).) Basic health care services are defined to include: physician services; hospital inpatient services; diagnostic laboratory services; home health services; and preventive health services. (Health & Saf. Code, § 1345, subd. (b).) DMHC's director is authorized to define the scope of required basic health care services. (Health & Saf. Code, § 1367, subd. (i).) By regulation, home health services (as part of basic health care services) are defined to include "where medically appropriate, health services provided at the home of an enrollee as prescribed or directed by a physician . . . . " (Cal. Code Regs., tit. 28, § 1300.67, subd. (e).) The parties agree that ABA can constitute a home health service; the dispute in this case concerns the identity of the proper ABA provider.

Licensure requirements are addressed in Knox-Keene. Health and Safety Code section 1367, subdivision (d) provides that a plan shall furnish "ready referral of patients to other providers" as appropriate. Knox-Keene defines a "provider" as "any professional person, organization, health facility, or other person or institution licensed by the state to deliver or furnish health care services." (Health & Saf. Code, § 1345, subd. (i).) Health and Safety Code section 1367, subdivision (b) provides that "[p]ersonnel employed by or under contract to the plan shall be licensed or certified by

6

their respective board or agency, where licensure or certification is required by law." Subdivision (f) requires the plan to "employ and utilize allied health manpower for the furnishing of services to the extent permitted by law and consistent with good medical practice." In short, Knox-Keene requires the use of licensed individuals when a license is required by law.

In 1999, the Legislature enacted Health and Safety Code section 1374.72, commonly referred to as the Mental Health Parity Act (MHPA). That statute provides that, beginning in July 2000, every health plan providing hospital, medical or surgical coverage must also "provide coverage for the diagnosis and *medically necessary treatment* of severe mental illnesses of a person of any age, and of serious emotional disturbances of a child" as specified in the statute. (Health & Saf. Code, §1374.72, subd. (a), italics added.) The statute specifically itemizes the "severe mental illnesses" that must be covered, including "[p]ervasive developmental disorder or autism." (Health & Saf. Code, § 1374.72, subd. (d)(7).) Thus, the MHPA requires all plans providing coverage under Knox-Keene to cover the "medically necessary treatment" of autism. The MHPA does not specifically define the term "medically necessary treatment," although it does state that certain benefits – outpatient services, inpatient hospital services, partial hospital services, and prescription drugs (if the plan otherwise covers prescription drugs) – must be provided. (Health & Saf. Code, § 1374.72, subd. (b).)

3.      *Resolution of Grievances*

"As part of its legislative mandate to 'ensure' access to quality care, the Department is required to establish a bifurcated grievance system and to 'expeditiously' and 'thoroughly' review patient grievances." (*California Consumer Health Care Council, Inc. v. Department of Managed Health Care* (2008) 161 Cal.App.4th 684, 687.) The independent medical review (IMR) grievance system resolves "disputed health care services." (Health & Saf. Code, § 1374.30.) The other system, which we refer to as the "standard grievance" system, resolves all other grievances, including coverage disputes.

7

To be resolved under IMR, a grievance must concern a "disputed health care service," which is defined as any service "eligible for coverage and payment under a health care service plan contract that has been denied, modified, or delayed by a decision of the plan . . . due to a finding that the service is not *medically necessary*. A decision regarding a disputed health care service relates to the practice of medicine and is not a coverage decision." (Health & Saf. Code, § 1374.30, subd. (b), italics added.)

When a grievance is resolved pursuant to IMR, an independent medical reviewer (or reviewers) determines whether the disputed health care service is medically necessary based on the specific needs of the patient, and such information as peer-reviewed scientific evidence, nationally recognized professional standards, and generally accepted standards of medical practice. (Health & Saf. Code, § 1374.22, subd. (b).) A plan must promptly implement the decision of an IMR. (Health & Saf. Code, § 1374.34, subd. (a).) If the IMR decision is in favor of the patient, the plan shall either promptly authorize the services, or reimburse the provider or the enrollee for services already rendered. (*Ibid.*)

In contrast, the standard grievance process is an administrative review conducted by DMHC. When a plan denies or delays services on the basis that the services are not covered under the plan, the plan is required to clearly specify the contract provisions that purportedly exclude coverage. (Health & Saf. Code, § 1368, subd. (a)(5).) If the patient disagrees, the patient may seek review by the DMHC, by means of a standard grievance. (Health & Saf. Code, § 1368, subd. (b)(1)(A).) The DMHC reviews the record and determines whether the challenged service is, in fact, covered. (Health & Saf. Code, § 1368, subd. (b)(5).)

4. *DMHC's Practice Regarding ABA Grievances - The March 2009 Memo*

Plan denials of ABA could involve both issues—i.e., whether ABA is medically necessary and whether ABA is covered by the plan. Initially, when the denials appeared to raise both questions, DMHC chose to send ABA grievances to IMR. As noted above, some of the early IMR decisions on ABA upheld the plans' denials on the basis that ABA was experimental and did not yet constitute the standard of care. By late-2007,

however, IMR decisions regarding ABA were consistently resolved in favor of its medical necessity.

As ABA became more medically accepted, plans focused their denials of ABA on coverage grounds. For example, some plans denied coverage for ABA by BACB-certified therapists because the plans did not provide coverage for mental health services provided by an *unlicensed* individual. Other plans denied coverage for ABA based on an exclusion for *any* treatment which *could* safely and effectively be provided by an *unlicensed* individual.

On March 9, 2009, DMHC issued a memorandum to health plans regarding "Improving Plan Performance to Address Autism Spectrum Disorders" (March 2009 memo). The memorandum was not adopted pursuant to the Administrative Procedures Act. Among other things, the March 2009 memo reconfirmed that plans must "[c]over all basic health care services required under [Knox-Keene], including speech, physical, and occupational therapies for persons with [autism], when those health care services are medically necessary." The memo goes on to state that plans must "[p]rovide mental health services only through providers who are licensed or certified in accordance with applicable California law." Thus, the March 2009 memo specifically required providers to be licensed if their services were to be covered by the plans.

With respect to grievances, the March 2009 memo states that, "[t]he DMHC will initially make a determination whether the service being sought is a covered health care service. If that determination is made in the affirmative, then any claim that a service is either: (1) experimental or investigational; or, (2) is not medically necessary to treat the patient's condition, will be referred for IMR as required under California law." In other words, the March 2009 memo stated that *all* grievances regarding services for autism raising both types of issues would *first* be resolved through the standard grievance procedure, and would only be sent to IMR if the coverage dispute was resolved in favor of the patient.

9

5.      *The Instant Action*

On June 30, 2009, Consumer Watchdog brought a petition for writ of mandate and complaint against DMHC and its director in her official capacity (collectively DMHC). Consumer Watchdog's operative first amended petition alleges it is a violation of the MHPA "for a health plan to refuse to cover any treatment for autism that is deemed medically necessary." (Emphasis omitted.) Consumer Watchdog further alleges the licensing requirement imposed by the March 2009 memo is unsupported, because the law requires coverage for any medically necessary treatment for autism "when it is provided by a licensed provider, a provider that is certified by a professional organization, or individuals who are supervised by a licensed or certified provider." (Emphasis omitted.)

6.      *Briefing, Argument, and the Trial Court's Ruling*

In support of its petition and complaint, Consumer Watchdog argued plans must provide ABA in all cases where it is medically necessary. In opposition, DMHC argued the Legislature "set forth state licensure as the bright-line consumer protection regarding practitioners of health services." DMHC argued it could not, consistent with Knox-Keene's licensure requirements, order the plans to provide coverage for ABA when administered by an unlicensed provider, including therapists certified by BACB— a private certification board.

The trial court concluded DMHC could, itself, impose a licensing obligation as part of its general duties to ensure that health care plans provide quality health care services and to protect the interests of enrollees. As providers of ABA work intensively with fragile autistic children, the court determined DMHC could reasonably require ABA providers to be subject to state licensing quality controls. Thus, the court concluded there was no clear, ministerial duty for DMHC to order ABA when provided

10

by BACB-certified therapists.[4]  It therefore denied the writ petition.  The court observed that Consumer Watchdog's remedy was "with the Legislature," not the courts.

As to the causes of action challenging DMHC's grievance resolution procedures, the trial court concluded the March 2009 memo was invalid, because DMHC failed to comply with the Administrative Procedures Act in adopting the regulations.  However, the court held DMHC could continue to exercise its discretion to resolve coverage disputes before sending an ABA grievance to IMR.

The trial court entered judgment directing DMHC to discontinue implementing, utilizing or enforcing the March 2009 memo.  The court denied all other relief.

7.     *The New Statute*

On October 9, 2011, the Legislature enacted Health and Safety Code section 1374.73 (the ABA statute).  The statute specifically governs ABA treatment.  Like the MHPA, the ABA statute applies, with certain exceptions, to every health plan providing hospital, medical or surgical coverage.  As of July 1, 2012, the ABA statute's effective date, those plans are required to "provide coverage for *behavioral health treatment* for pervasive developmental disorder or autism."  (Health & Saf. Code, § 1374.73, subd. (a)(1), italics added.)  "Behavioral health treatment" is defined to include various treatment programs, and *explicitly includes ABA*.  (Health & Saf. Code, § 1374.73, subd. (c)(1).)  To constitute behavioral health treatment which must be covered, the following criteria must be met:  (1) the treatment must be prescribed by a licensed physician or psychologist; (2) the treatment must be provided under a treatment plan prescribed by a "qualified autism service provider," and be administered by either a qualified autism service provider, or a "qualified autism service professional" or "qualified autism service paraprofessional" supervised by the qualified autism service provider; (3) the treatment plan must have measurable goals and be reviewed at least

---

[4]     While DMHC argues the trial court's result was correct, it does not adopt the court's conclusion.  DMHC does not suggest it could impose a licensure requirement that was not present in Knox-Keene or the MHPA.  (*Kaiser Foundation Health Plan, Inc. v. Zingale* (2002) 99 Cal.App.4th 1018, 1024, 1027.)

11

every six months by the qualified autism service provider; and (4) the treatment plan must not be used for day care or educational services.  (Health & Saf. Code, § 1374.73, subds. (c)(1)(A)-(c)(1)(D).)

A "qualified autism service provider" is defined as a person either (1) licensed under California law (as a physician, psychologist, occupational therapist, or one of several other enumerated professionals) who designs, supervises or provides treatment for pervasive developmental disorder or autism (Health & Saf. Code, § 1374.73, subd. (c)(3)(B)); *or* (2) "certified by a national entity, such as the [BACB] and who designs, supervises, or provides treatment for pervasive developmental disorder or autism."  (Health & Saf. Code, § 1374.73, subd. (c)(3)(A).)

A "qualified autism service professional" is defined as anyone approved "as a vendor by a California regional center to provide services as an Associate Behavior Analyst, Behavior Analyst, Behavior Management Assistant, Behavior Management Consultant, or Behavior Management Program."  (Health & Saf. Code, § 1374.73. subd. (c)(4)(D).)  These categories include, by regulation, individuals certified by the BACB as Board Certified Behavior Analysts and Board Certified Associate Behavior Analysts.[5]  (Cal. Code Regs., tit. 17, § 54342, subds. (a)(8) & (a)(11).)

A "qualified autism service paraprofessional" is defined as "an unlicensed and uncertified individual" who has adequate education, training, and experience, as certified by a qualified autism service provider.  (Health & Saf. Code, § 1374.73, subd. (c)(5).)

---

[5]    The categories also include individuals with a bachelor's degree and certain experience in ABA even without BACB certification.  (Cal. Code Regs., tit. 17, § 54342, subd. (a)(12).)

12

In short, with respect to all health plans subject to the ABA statute, they are required to cover ABA treatment for autistic children when provided, or supervised, by a BACB-certified therapist. Thus, the ABA statute provides precisely the relief sought by Consumer Watchdog in the instant action, and Consumer Watchdog does not argue otherwise.[6]

However, three types of health plans are specifically exempted from the obligations of the ABA statute: (1) health plans in the Medi-Cal program; (2) health plans in the Healthy Families Program;[7] and (3) health plans entered into with the Public Employees' Retirement System (PERS). (Health & Saf. Code, § 1374.73, subd. (d).) As health plans in the Medi-Cal program are also exempt from the MHPA, there are, in effect, two types of health plans (Healthy Families and PERS) that are subject to the requirements of the MHPA, but not the requirements of the ABA statute.

By its terms, "[n]othing in [the ABA statute] shall be construed to limit the obligation to provide services under Section 1374.72"—i.e., the MHPA. (Health & Saf. Code, § 1374.73, subd. (e).)

---

[6] The ABA statute becomes inoperative on January 1, 2017, and, if not extended, is repealed as of such date. (Health & Saf. Code, § 1374.73, subd. (g).)

[7] Pursuant to Insurance Code section 12694.1, subscribers enrolled in the Healthy Families Program were to begin to transition to the Medi-Cal program no sooner than January 1, 2013, and the Healthy Families Program was to cease to enroll new subscribers no sooner than the date the transition begins. (Ins. Code, § 12694.1, subds. (a) & (f).) Welfare and Institutions Code section 14005.27 prescribes four phases for the State Department of Health Services to transition individuals from the Healthy Families Program to the Medi-Cal program. (See Welf. & Inst. Code, § 14005.27, subd. (e)(1).) Phase 4 of the transition was to begin no earlier than September 1, 2013. (*Id.*, § 14005.27, subd. (e)(1)(D).) The parties have not advised this court of the current status of the transition.

### ISSUES ON APPEAL

While the applicable legislative framework and procedural history of this case are somewhat complex, the issues presented by this appeal are relatively straightforward: (1) Is Consumer Watchdog's appeal moot in light of the ABA statute? (2) With respect to the grievances filed between the date of Consumer Watchdog's petition and the effective date of the ABA statute, should the trial court have required DMHC to direct the plans to provide ABA from BACB-certified providers? (3) What are the DMHC's duties with respect to grievances for ABA provided by BACB-certified therapists to enrollees in plans *exempted* from the ABA statute?

The following additional issues are also raised with respect to the March 2009 memo: (4) Is DMHC's cross-appeal untimely? (5) Did the trial court err in refusing to direct DMHC to return to its pre-March 2009 memo procedures?

### DISCUSSION

1.    *Only Prospective Injunctive Relief Is Available*

Because it directly impacts the issues properly before us in this appeal, we must be mindful of the limitations of Consumer Watchdog's petition and complaint. As we discuss more thoroughly in the next section, Consumer Watchdog's pleading sought only prospective relief, by means of writ of mandate, injunction and declaratory relief. It sought an order directing DMHC to respond to grievances in a certain way, and to cease implementing the March 2009 memo. It sought no relief with respect to closed grievances. Moreover, the petition and complaint named only DMHC as a defendant. No insurance plan is named, and this case is not a class action that seeks compensation for wrongfully denied ABA services.

Because DMHC is the only defendant, the relief Consumer Watchdog sought is fundamentally overbroad. Consumer Watchdog sought a writ or injunction directing DMHC to respond to a grievance by ordering coverage for ABA where ABA was medically necessary and provided or supervised by a licensed or certified professional. But neither we, nor the trial court, could issue a blanket decision mandating coverage for ABA in every case in which it is medically necessary without first allowing the

14

health plans an opportunity to be heard on whether their coverage exclusions apply. However, no health plan is a defendant in this action, and no policy exclusion is at issue in this case. Instead, Consumer Watchdog solely challenges DMHC's determination that coverage is not required for mental health services rendered by a provider who is not licensed under California law.

We therefore must construe Consumer Watchdog's petition and complaint as seeking an order enjoining DMHC from upholding a denial of coverage for medically necessary ABA treatment performed by a BACB-certified provider where the plan's denial is based *on the ground that coverage is not required when the provider is not licensed under California law*. As we explain next, because Consumer Watchdog did not request to reopen closed grievances, any injunctive relief we might direct can operate only prospectively.

2.      *Consumer Watchdog Did Not Seek Relief for Past Grievances*

Following enactment of the ABA statute, we requested additional briefing from the parties concerning whether the issues raised on appeal were moot in light of the legislative action. In response, DMHC maintained the appeal was moot, citing the operative petition and complaint's prayer for relief, which seeks only "prospective relief" with respect to DMHC's "*future responses* to enrollee grievances." Conversely, Consumer Watchdog argued this court should direct the trial court to issue relief concerning grievances that have already been resolved by DMHC. We agree with DMHC's position that Consumer Watchdog sought only prospective relief in the trial court.

Consumer Watchdog's first amended petition and complaint does not seek redress for previously adjudicated grievances. Rather, with respect to mandamus and injunctive relief, the prayer for relief states: "*In response to any enrollee complaint or grievance* regarding a health plan's decision to deny ABA treatment to an autistic enrollee on the ground that it is not a covered benefit, [the DMHC] shall 'order' the plan—where ABA is both medically necessary and is provided by . . . a provider that is certified by a professional organization, or individuals who are supervised by a . . .

15

certified provider—to either 'promptly offer and provide' ABA to the enrollee, or to 'promptly reimburse' the enrollee for 'any reasonable costs' associated with obtaining ABA, whichever is applicable." (Italics added.) Similarly, with respect to declaratory relief, Consumer Watchdog sought a judicial declaration that DMHC and its director "*have* a legal duty to enforce the Mental Health Parity Act and the Knox-Keene Act to require that health plans *shall* provide coverage for ABA when both medically necessary and provided by . . . a provider that is certified by a professional organization, or individuals who are supervised by a . . . certified provider." (Italics added.) In short, the petition and complaint do not seek relief directing DMHC to reopen closed grievances and resolve them in favor of coverage.

Likewise, in its briefs to the trial court, Consumer Watchdog sought only prospective relief—a writ of mandate directing DMHC to respond to future enrollee grievances by ordering plans to cover ABA therapy, regardless of the provider's licensure status. Consumer Watchdog also did not request relief for previously adjudicated grievances at the hearing on the petition. Because Consumer Watchdog did not seek relief regarding previously adjudicated grievances in the trial court, it cannot seek such relief in this court. (See *Browne v. County of Tehama* (2013) 213 Cal.App.4th 704, 725 [petitioners forfeited an argument regarding the legality of an ordinance because they failed to challenge it on that basis in their petition]; *Richmond v. Dart Industries, Inc.* (1987) 196 Cal.App.3d 869, 874 [a plaintiff cannot pursue a theory of relief on appeal he did not pursue in the trial court]; *O'Donnell v. Excelsior Amusement Co.* (1931) 110 Cal.App. 685, 691 [plaintiff could not pursue a claim for punitive damages on appeal when he did not assert the claim below].)

Consumer Watchdog is not simply arguing a new legal theory to support a claim for relief it sought in the trial court. It seeks *relief* in this court that *it did not seek below*. "It is elementary that an appellate court is confined in its review to the proceedings which took place in the trial court. [Citation.] Accordingly, when a matter was not tendered in the trial court . . . '[it] is outside the scope of review.' " (*Bach v. County of Butte* (1989) 215 Cal.App.3d 294, 306 (*Bach*).) " '[A] judgment will not be reversed on appeal because of the failure of the lower court to give relief not embraced in the pleadings and which it was not asked to give." (*Dimmick v. Dimmick* (1962) 58 Cal.2d 417, 423 (*Dimmick*).) "This rule precludes a party from asserting on appeal claims to relief not asserted in the trial court." (*Id.* at p. 422.)

Although the concurring and dissenting opinion agrees that Consumer Watchdog's operative pleading did not seek retroactive relief with respect to closed grievances, it nonetheless presumes that this court can grant such relief. This conclusion is based on the assumption that when a party seeks a writ of mandate it *necessarily* seeks a judgment granting relief as of the date the petition was filed. No apposite authority is cited for this proposition.

We are not persuaded by the concurring and dissenting opinion's reliance on *Morris v. Noguchi* (1983) 141 Cal.App.3d 520 (*Morris*). *Morris* does not hold, as the concurring and dissenting opinion's citation to the case suggests, that a petitioner for writ of mandate necessarily seeks a judgment granting relief as of the date the petition is filed. On the contrary, the statement from *Morris* upon which the dissent relies is nothing more than the relatively unremarkable proposition, stated in dicta, that " ' "[t]he act which will be compelled by *mandamus* must be one to the performance of which the complaining party is entitled at the institution of his proceeding." ' " (*Id.* at p. 523.) This simply means that a mandate claim must be ripe for review when a petition is filed. It is not authority for the proposition that every possible form of relief that is ripe for review must necessarily have been sought when the mandamus petition was filed.

*Morris* lends no support to the concurring and dissenting opinion's argument that we should adjudicate a claim for relief that was never presented to the trial court.[8]

It is not enough that Consumer Watchdog could have sought mandamus relief relating to already adjudicated grievances. The fact that it did not seek such relief necessarily limits the scope of our review. We decline to issue an advisory opinion on a claim Consumer Watchdog did not make in the trial court.

---

[8] The concurring and dissenting opinion suggests we are refusing to address an important question "on the stated ground that the issue was not raised in the trial court by Consumer Watchdog." (Con. & dis. opn., *post*, at p. 1.) Respectfully, this mischaracterizes what we have stated. We are well-aware and acknowledge that the proceedings below focused almost exclusively on whether a professional license was required to legally administer ABA prior to enactment of the ABA statute. Indeed, it could have been no other way, as the ABA statute was enacted only after the case made its way to this court on appeal. Be that as it may, we have no mandate to decide what should have been done with grievances adjudicated before the ABA statute's enactment, because Consumer Watchdog did not seek relief for such grievances in the trial court.

Because the concurring and dissenting opinion focuses on whether the *issue* was raised below, it largely overlooks the impact that Consumer Watchdog's limited request for *relief* has on the appropriate scope of our review. (*Dimmick, supra,* 58 Cal.2d at p. 423; *Bach, supra,* 215 Cal.App.3d at p. 306.) The concurring and dissenting opinion acknowledges "the complaint in no way sought retroactive relief (i.e., relief respecting grievances filed prior to June 30, 2009)" and "[t]here is nothing in the prayer seeking the reopening of already-resolved grievances." (Con. & dis. opn., *post*, at p. 4, fn. 6.) It nevertheless elects to adjudicate whether relief would have been available for such grievances (ultimately concluding no relief is available), due in large measure to the fact that *this court* raised the issue when we asked the parties to address whether the ABA statute mooted Consumer Watchdog's appeal. (Con. & dis. opn., *post*, at pp. 6-7.) We agree, of course, that the parties litigated whether state licensure laws barred *prospective* coverage for ABA provided by BACB-certified therapists prior to enactment of the ABA statute. However, as the concurring and dissenting opinion recognizes, there was "*no* allegation that DMHC had a clear, present, and mandatory duty to *reopen* any wrongly-*resolved* grievances." (*Ibid.*, italics added.) Because Consumer Watchdog is "preclude[d] . . . from asserting on appeal claims to relief not asserted in the trial court" (*Dimmick,* at p. 422), we have no cause to address such grievances.

### 3. *The Bulk of the Appeal Is Moot*

"[I]t is clear under a long and uniform line of California precedents that the validity of the judgment must be determined on the basis of the current statutory provisions, rather than on the basis of the statutory provisions that were in effect at the time the injunctive order was entered. As observed by Witkin: 'Because relief by injunction operates in the future, appeals of injunctions are governed by the law in effect at the time the appellate court gives its decision.' [Citations.]" (*Marine Forests Society v. California Coastal Com.* (2005) 36 Cal.4th 1, 23.) "The reason a reviewing court applies current rather than former law when reviewing an injunctive decree is because injunctive relief operates in the future. [Citations.] It would be an idle gesture to affirm an injunctive decree because it was correct when rendered, 'with full knowledge that it is incorrect under existing law, and with full knowledge that, under existing law, the decree as rendered settles nothing so far as the future rights of these parties are concerned.' [Citation.] It does not matter whether the Legislature intended the new law to be retroactive. The reviewing court is interested in the law's prospective effect since that is when the decree under review will operate." (*City of Watsonville v. State Dept. of Health Services* (2005) 133 Cal.App.4th 875, 884.)

Consumer Watchdog sought prospective relief enjoining DMHC from upholding a denial of coverage for medically necessary ABA treatment provided or supervised by a BACB-certified therapist. This relief, in large measure, has been provided by the ABA statute. With respect to all plans which were not expressly excluded from the ABA statute, the statute *requires* those plans to provide coverage for ABA when provided or supervised by a BACB-certified therapist. DMHC concedes this, and has implemented the statute. Consumer Watchdog's appeal is largely, but not entirely, moot.

19

4.     *DMHC May Not Uphold a Denial of Coverage for ABA Performed or Supervised by a BACB-Certified Therapist on the Basis the Provider Is Not Licensed, Even When the Plan Is Exempted from the ABA Statute*

We must decide whether DMHC may still uphold coverage denials by plans expressly exempted from the ABA statute; these are plans in the Healthy Families Program and plans entered into with PERS. Such plans are not required under the ABA statute to provide coverage for ABA provided or supervised by BACB-certified providers. (Health & Saf. Code, § 1374.73, subd. (d).) This does not mean, however, that these plans are relieved of their obligation to cover "basic health care services" under Knox-Keene (Health & Saf. Code, § 1367, subd. (i)) and "medically necessary treatment of severe mental illnesses" under the MHPA (Health & Saf. Code, § 1374.72, subd. (a)). Indeed, the ABA statute unequivocally states that "[n]othing in this section shall be construed to limit the obligation to provide services under Section 1374.72." (Health & Saf. Code, § 1374.73, subd. (e).)

DMHC no longer disputes that ABA can, in the appropriate case, constitute a basic health care service and medically necessary treatment for autism under Knox-Keene and the MHPA. As we explained, the dispute in this case concerns the identity of the proper providers of ABA and whether Knox-Keene's licensure requirements preclude DMHC from directing plans to cover ABA when provided by a BACB-certified therapist who is not otherwise licensed to administer ABA. In resolving this question with respect to the plans that are excepted from the ABA statute, we must determine whether the effect of that exception is to create a separate licensing requirement when a BACB-certified therapist administers ABA to an individual enrolled in a plan that is not covered by the ABA statute. We hold that the exception cannot be interpreted to create such an inconsistent licensing regime.

The exception for PERS and Healthy Families plans does not mandate that we ignore the existence of the ABA statute when considering these plans. As noted above, we apply the law as it currently exists in resolving a claim for injunctive relief on appeal. Moreover, "[w]hen two seemingly inconsistent statutes apply, we harmonize

20

the competing statutes and 'avoid an interpretation that requires one statute to be ignored.' [Citation.]" (*Watkins v. County of Alameda* (2009) 177 Cal.App.4th 320, 343.) As we shall explain, under current law, the argument is no longer valid that the licensure requirements set forth in Knox-Keene preclude DMHC from ordering plans to cover ABA treatment when administered by BACB-certified providers.

The ABA statute constitutes legislative approval of the practice of ABA by BACB-certified providers and individuals under their supervision. That legislative approval effectively qualifies BACB-certification as a "license" to provide ABA. Business and Professions Code section 23.7 defines "license" to mean a "license, certificate, registration, or *other means* to engage in a business and profession regulated by this code . . . ." (Italics added.) The ABA statute states that ABA shall be administered by a "qualified autism service provider," and defines "qualified autism service provider" as, inter alia, "[a] person . . . that is certified by a national entity, such as the [BACB], that is accredited by the National Commission for Certifying Agencies . . . ." (Health & Saf. Code, § 1374.73, subds. (c)(1)(B) & (c)(3)(A).) With the passage of the ABA statute, BACB certification fits squarely within Business and Professions Code section 23.7's definition of "license"—that is, BACB certification is, in effect, an "other means" by which one is authorized to provide ABA in this state.

Our conclusion is consistent with the broad interpretation other courts have given to the definition of "license" under Business and Professions Code section 23.7. In *Prince v. Sutter Health Central* (2008) 161 Cal.App.4th 971, 974 (*Prince*), the court determined that an "unlicensed social worker" was a "health care provider" under the Medical Injury Compensation Reform Act (MICRA), notwithstanding that MICRA defines the term "health care provider" to mean "any person *licensed* or certified" under applicable licensing laws. (Civ. Code, § 3333.2, subd. (c)(1), italics added; see *Prince*, at p. 975.) Citing Business and Professions Code section 23.7, the *Prince* court held that the social worker was "[i]n effect . . . licensed," even though she did not hold a "license" in the literal sense, because she was authorized by the Legislature to engage in the subject activities. (*Prince*, at pp. 975-976 [observing that social worker's

21

registration with the Board of Behavioral Sciences authorized her to engage in healing arts while she worked toward a license under Bus. & Prof. Code, § 4996.18, subd. (a)].)

Like the definition of "health care provider" found in MICRA, Knox-Keene defines the term "provider" to mean "any . . . person or institution *licensed by the state* to deliver or furnish health care services." (Health & Saf. Code, § 1345, subd. (i), italics added.) Based on this definition, DMHC has taken the position that it cannot direct plans to cover ABA treatment when the prescribed "provider" is a BACB-certified therapist who is not otherwise licensed by the state. As we have explained, with the passage of the ABA statute, BACB certification is, in effect, a "license" as defined by state licensing laws, inasmuch as the certification constitutes a legislative authorization to provide ABA in this state as a "qualified autism service provider." (See Health & Saf. Code, § 1374.73, subds. (c)(1)(B) & (c)(3)(B).) This authorization applies regardless of whether a plan is required, or exempted from the requirement, to provide coverage for ABA treatment by the ABA statute. That is, legislative authorization to provide ABA in this state cannot depend upon the health plan in which a patient is enrolled. To hold otherwise would create an irrational inconsistency in our state licensing laws.[9]

---

[9] Our concurring and dissenting colleague agrees with this conclusion, but argues we also should address whether BACB-certified therapists were engaged in the unlicensed practice of medicine prior to enactment of the ABA statute. We have no cause to address this issue in this case. Whatever applicability Business and Professions Code section 2052's proscription against the unlicensed practice of medicine may have had prior to passage of the ABA statute, it is clear that after the ABA statute, BACB-certified therapists are "authorized to perform [ABA] pursuant to a certificate obtained in accordance with some other provision of law . . . ." (Bus. & Prof. Code, § 2052.) Indeed, DMHC acknowledges that the "[ABA statute] is that 'other provision of law' that provides an exemption [from] licensure requirements" for BACB-certified therapist providing ABA in this state. In light of the interests at stake, we see no reason to reach beyond the claims properly presented to arrive at a conclusion no party wishes to advance.

22

Thus, while the ABA statute only *requires* certain plans to provide coverage for ABA by BACB-certified providers and individuals under their supervision, the ABA statute also has the effect of licensing BACB-certified providers and those under their supervision to practice ABA. We stress that we are not concluding that the health plans exempted from the ABA statute are, in fact, subject to its terms. The ABA statute does not require these plans to provide ABA; we do not require them to do so, either. We simply hold that DMHC's practice of *upholding denials* of coverage *on the basis* that BACB-certified therapists are *unlicensed* is no longer legally justified. With the passage of the ABA statute, the Legislature has concluded that these individuals possess sufficient qualifications such that further licensure is unnecessary.

DMHC cannot uphold a denial of coverage for ABA provided or supervised by a BACB-certified therapist on the basis that the therapist is unlicensed. Our interpretation of the legislative authorization and effective licensure of BACB-certified therapist to perform ABA in this state necessarily applies even when coverage is provided by a plan that is exempted from the requirements of the ABA statute. To that extent, Consumer Watchdog is entitled to relief.

5.    *DMHC's Cross-Appeal is Untimely*

We next turn to issues surrounding the March 2009 memo and the trial court's conclusions that: (1) the memo violated the Administrative Procedures Act; but (2) DMHC would not be required to return to its pre-March 2009 method of resolving grievances, and order all grievances regarding ABA which raised both coverage and medical necessity issues to IMR.

DMHC purported to appeal from the court's order declaring the March 2009 memo violative of the Administrative Procedures Act. We cannot reach this issue, because DMHC's notice of cross-appeal is untimely under any applicable Rule of Court.

The notice of cross-appeal was not filed within 60 days of service of notice of entry of judgment. (Cal. Rules of Court, rule 8.104(a)(1)(A).) The motion for new trial extended the time to appeal until 30 days after the clerk mailed notice of entry of denial.

(Cal. Rules of Court, rule 8.108(b)(1)(A).)  Such notice was mailed on April 1, 2011; the notice of cross-appeal was therefore not timely under that extension.  Finally, a notice of appeal extends the time for filing a notice of cross-appeal until 20 days after the clerk serves notification of the first appeal.  (Cal. Rules of Court, rule 8.108(g)(1).)  In this case, the notification was served on April 15, 2011.  The notice of cross-appeal was therefore untimely under this extension provision as well.

DMHC states it timely transmitted the notice of cross-appeal through Federal Express, and provides evidentiary support for this claim.  There is no evidence, however, as to *when* the document was delivered by Federal Express to the court.  It is clear that one of two things occurred.  Either:  (1) Federal Express erred, and did not timely deliver the shipment; or (2) Federal Express timely delivered the shipment, but employees of the Los Angeles Superior Court failed to timely mark the notice of cross-appeal as received.[10]  DMHC, however, has no evidence that the error was the clerk's, rather than Federal Express's.  DMHC has no tracking information from Federal Express indicating when the package was delivered and no declaration from its counsel indicating that it confirmed timely receipt of the notice of cross-appeal with the superior court clerks.  Indeed, as between Federal Express and the superior court clerks, the presumption runs in favor of the clerks.  "It is presumed that official duty has been regularly performed."  (Evid. Code, § 664.)  While there is a similar presumption that a letter correctly addressed and properly mailed has been received "in the ordinary course of mail" (Evid. Code, § 641), the statute has "no application to the filing of a notice of appeal."  (*Thompson, Curtis, Lawson & Parrish v. Thorne* (1971) 21 Cal.App.3d 797, 801.)  DMHC's cross-appeal must therefore be dismissed as untimely.

---

**10**     Under California Rules of Court, rule 8.25(b)(1), a document is deemed filed on the date the clerk receives it.  Thus, if the clerk timely received the notice of cross-appeal, even if it was not marked as filed until later, it would be considered timely filed.

6. *The Trial Court Did Not Err in Rejecting Consumer Watchdog's Request That DMHC Be Directed to Return to Pre-March 2009 Memo Procedures*

After the trial court invalided the March 2009 memo, Consumer Watchdog sought the additional relief of an order directing DMHC to return to its pre-March 2009 methods of resolving grievances relating to the provision of ABA – specifically, to direct that those grievances be resolved under IMR. The trial court correctly denied this relief.

Health and Safety Code section 1374.30, subdivision (d)(3) grants DMHC discretion to determine whether a grievance raising an issue of medical necessity is to be resolved in IMR or through the standard grievance procedure. Subdivision (d)(2) of that statute expressly states, "[i]n any case in which an enrollee or provider asserts that a decision to deny, modify, or delay health care services was based, in whole or in part, on consideration of medical necessity, the department shall have the final authority to determine whether the grievance is more properly resolved pursuant to an [IMR] or [as a standard grievance]."

DMHC cannot be directed to resolve all grievances raising issues of medical necessity and coverage under IMR. DMHC must exercise its discretion with respect to each grievance.

### DISPOSITION

The judgment is reversed in part and modified to enjoin DMHC from upholding a plan's denial of coverage for ABA services to be provided or supervised by a BACB-certified individual made on the basis that the provider is not licensed.  This applies to all plans within DMHC's jurisdiction, including plans exempted from the ABA statute.  The judgment is otherwise affirmed.  DMHC's cross-appeal is dismissed as untimely.  The parties shall bear their own costs on appeal.

### CERTIFIED FOR PUBLICATION

KITCHING, J.

I concur:

KLEIN, P. J.

26

**CROSKEY, J., Concurring and Dissenting.**

I respectfully disagree with my colleagues' refusal to address the important question of whether DMHC, prior to the effective date of the ABA statute, could properly deny plan coverage for autism therapy provided by *unlicensed* persons. They do so on the stated ground that the issue was not raised in the trial court by Consumer Watchdog. This is totally contrary to the record in this matter and it makes a real difference in the relief to which Consumer Watchdog is entitled. Moreover, the issue of licensure with respect to the provision of autism therapy is a seriously disputed and important issue and, apart from the ABA statute (which has a sunset clause), has not been addressed by the Legislature.

Since Consumer Watchdog's petition[1] was initially filed in this action on June 30, 2009, the parties have fully litigated the issue of whether the law *prior* to the effective date of the ABA statute (Health & Saf. Code, § 1374.73; eff. July 1, 2012) permitted DMHC to uphold a denial of coverage for ABA[2] to be provided or supervised by a BACB-certified therapist,[3] on the basis that such therapist was not licensed. Indeed, it was the *sole* issue briefed by the parties on appeal until such time as this court, on its own motion, suggested the possibility that the ABA statute may have mooted any claims for prospective relief. Following our initial oral argument, which was limited to the issue of mootness, we were persuaded that the matter was not moot. We then set the case on calendar for argument on the merits, permitted additional

---

[1]   Unless the context otherwise requires, I use the term "petition" to refer to the Petition for Writ of Mandate and Complaint for Declaratory Relief and Injunction filed by Consumer Watchdog on June 30, 2009.

[2]   I use the acronym "ABA" in the same sense as it is defined and used in the majority opinion; an intensive form of therapy which has had documented success in treating the symptoms of autism in young children and which is known as Applied Behavioral Analysis.

[3]   As stated in the majority opinion, "BACB" refers to the Behavior Analyst Certification Board, a private organization that certifies therapists as qualified to provide ABA therapy.

1

briefing and, in fact, invited amicus curiae briefs on those issues raised by the parties' original briefing (primarily relating to the impact of the licensure laws on the provision of ABA therapy by unlicensed BACB-certified therapists) which the majority opinion has now concluded we have no basis to reach or discuss.

After substantial briefing, and a second oral argument, we resolved those issues, concluding that, prior to the effective date of the ABA statute, BACB-certified therapists were engaging in the unlicensed practice of medicine or, more specifically, the psychology sub-practice thereof. We therefore held that DMHC had properly upheld denials of coverage, prior to July 1, 2012, on that basis. In response to a petition for rehearing, which challenged the *merits* of our resolution of the licensure issues, but not the *procedural basis* for doing so, the majority now concludes that, in fact, those issues were not properly before this court, and therefore now declines to address them.

In my view, this court should not avoid reaching issues which were in fact (1) raised by Consumer Watchdog's 2009 petition, (2) litigated by the parties and (3) the principal subject on which the parties' specifically sought appellate guidance. Thus, while I concur with the majority's conclusion that the ABA statute constitutes an effective "license" for BACB-certified practitioners from the date it became effective (July 1, 2012),[4] I respectfully dissent from that portion of the opinion which declines to address whether BACB-certified practitioners were required to hold a professional license sufficient to allow them to perform such services prior to July 1, 2012. The majority opinion's rationale for declining to either consider or resolve the existence of this critical question is not supported by the record in this matter.

---

[4] As the majority opinion's analysis is limited to prospective relief sought by Consumer Watchdog, the majority grants Consumer Watchdog relief from the date of the final judgment to be entered in this case, and not from the effective date of the ABA statute. (See 8 Witkin, Cal. Procedure (5th ed. 2008) Extraordinary Writs, § 205, p. 1108.)

2

1. *The Issue Is Properly Before This Court*

There are three important reasons why the majority opinion's embrace of judicial impotency should be rejected in this case. First, Consumer Watchdog's petition clearly sought resolution of the issue as to whether the law prior to the effective date of the ABA statute required DMHC to order plans to provide coverage for the medically necessary services of unlicensed but BACB-certified practitioners of ABA. Second, the issue was fully litigated by the parties and amici. Third, after we issued our opinion addressing the issue, no party or amicus argued or even suggested that the issue was not properly before the court.

a. *Consumer Watchdog's Petition Raised the Issue*

There are two bases for my conclusion that Consumer Watchdog's petition did in fact, raise this issue. First, Consumer Watchdog clearly sought relief from the date of its petition. Second, Consumer Watchdog's petition sounded in equity, seeking declaratory relief, and the courts are therefore required to resolve all outstanding issues between the parties.

In its first amended petition, Consumer Watchdog alleged that, by failing to compel plans within its jurisdiction to provide coverage for ABA therapy provided or supervised by an unlicensed but BACB-certified practitioner, DMHC "ha[d] violated, and will continue to violate, [its] clear, present, and mandatory duty" to enforce Knox-Keene and the MHPA. Consumer Watchdog alleged that "in all cases in which an enrollee" has filed a grievance regarding the denial of such ABA, DMHC had a duty to order the enrollee's plan to either promptly offer and provide the ABA or promptly reimburse the enrollee for the reasonable cost of the ABA. Consumer Watchdog went on to assert that issuance of a writ would be necessary to "ensure that autistic children receive critically needed ABA therapy. And time is of the essence in providing for the delivery of ABA, as the medical evidence conclusively demonstrates that early and consistent ABA therapy is most effective." The prayer for relief sought a writ of mandate directing that "[i]n response to any enrollee complaint or grievance regarding a health plan's decision to deny ABA treatment to an autistic enrollee on the ground that

3

it is not a covered benefit, [DMHC] shall 'order' the plan – where ABA is both medically necessary and is provided by a . . . provider that is certified by a professional organization, or individuals who are supervised by a . . . certified provider – to either 'promptly offer and provide' ABA to the enrollee, or to 'promptly reimburse' the enrollee for 'any reasonable costs' associated with obtaining ABA, whichever is applicable."

Consumer Watchdog alleged that the DMHC was, *at the time*, violating its statutory duty.  It further alleged that time was of the essence.  It therefore should be obvious that Consumer Watchdog intended to seek relief with respect to all grievances *filed after the date* of the filing of its petition.[5]  (Cf. *Morris v. Noguchi* (1983) 141 Cal.App.3d 520, 523 [when a party seeks mandate, it argues that it is entitled to relief at the institution of proceedings].)  I would therefore conclude that this record plainly demonstrates that Consumer Watchdog did seek relief with respect to a class of grievances which pre-dated the effective date of the ABA statute – those which arose after the commencement of this action.[6]

---

[5]     Indeed, it certainly cannot be true that Consumer Watchdog, which filed its complaint on June 30, 2009, intended to seek relief for autistic children beginning only in 2014 or later.  Nonetheless, that is the unfair and unjust result now forced upon them by the majority opinion's abdication of its responsibility to decide the issues that have, in fact, been properly presented to this court.

[6]     I do agree with the majority that the language of the complaint in no way sought retroactive relief (i.e., relief respecting grievances filed prior to June 30, 2009).  There is nothing in the prayer seeking the reopening of already-resolved grievances, and, indeed, no allegation that DMHC had a clear, present, and mandatory duty to reopen any wrongly-resolved grievances.  However, the fact that the petition sought only prospective relief does not mean that the petition sought prospective relief *from the date of any writ ultimately to be issued*.  Instead, we should review the language of the petition to determine whether Consumer Watchdog sought relief *from the date it was filed*.

Moreover, the operative pleadings stated a cause of action seeking declaratory relief, regarding "the obligations and duties of [DMHC] under the [MHPA], [Knox-Keene], and their implementing regulations" with respect whether ABA must be covered when provided or supervised by a BACB-certified individual. "In actions for declaratory relief, the court should attempt to do complete equity, resolving all questions actually involved in the case as between all of the respective parties. [Citation.]" (*Amerson v. Christman* (1968) 261 Cal.App.2d 811, 823.) "It is the duty of the court hearing the action for declaratory relief to make a complete determination and disposition of the controversy." (*Ibid.*) The majority has narrowly construed Consumer Watchdog's petition, holding that the failure to specifically seek "retroactive" relief bars our consideration of whether DMHC properly resolved *any* grievances in the past. But "in an action for declaratory relief the rights of the parties are to be determined upon the facts found and are not limited by the issues joined or by claims of counsel." (*Id*. at p. 824.) "An action for declaratory relief is equitable, and a court of equity will administer complete relief when it assumes jurisdiction of a controversy. [Citation.] Hence, in such an action it is proper for the court to grant any relief consistent with the evidence and the issues embraced by the pleadings. [Citations.]" (*Westerholm v. 20th Century Ins. Co.* (1976) 58 Cal.App.3d 628, 632, fn. 1.) "In an action seeking declaratory relief the court must do complete justice, even though it extend beyond the technical reach of the pleadings. [Citations.]" (*Bisno v. Sax* (1959) 175 Cal.App.2d 714, 731.) Thus, while I do believe Consumer Watchdog's petition did seek relief from the date of the commencement of the action, even if it had not, principles of equity require that this court address and resolve the issue as to the resolution of plan grievances arising on or after June 30, 2009, but prior to July 1, 2012, as part of the declaratory relief cause of action. That question was an integral part of the controversy between the parties.

5

b. *The Issue Was Fully Litigated*

The issue of whether the law, *prior* to the effective date of the ABA statute, required DMHC to order plans within its jurisdiction to cover ABA when it was to be provided, or supervised, by a BACB-certified individual, irrespective of whether the therapist possessed a license authorizing the therapist to provide such therapy, was fully litigated before the trial court. Indeed, as the ABA statute was not enacted until after the trial court's judgment, it was the *sole* issue litigated before the trial court.[7]

The initial briefing on appeal followed the same course, with Consumer Watchdog arguing at length that Knox-Keene and the MHPA require plans to cover medically necessary ABA therapy when provided or supervised by a BACB-certified therapist, regardless of licensure. DMHC responded in kind, arguing that it had no ministerial duty, prior to the effective date of the ABA statute, to compel health plans to provide coverage for ABA treatment provided by unlicensed individuals. I emphasize that this was *the* dispute presented to this court for resolution.

Upon this court's initial review of the briefs and record, the court informed counsel that it sought additional briefing on whether the appeal should be dismissed as moot, in light of the recent enactment of the ABA statute. In response to our request, Consumer Watchdog argued that the appeal was not moot because the exclusion of Healthy Families and PERS plans from the scope of the ABA statute meant that those plans were still governed by the law prior to the enactment of the ABA statute. Consumer Watchdog argued, "an actual, live controversy very much still exists with respect to the legal dispute that lies at the heart of this appeal—whether Business and Professions Code section 2052 or any other provision of law requires that behavior analysts who administer medically necessary ABA therapy as a treatment for autistic children must be licensed by the state." Consumer Watchdog also argued that its prayer

---

[7] The majority opinion suggests that, because Consumer Watchdog did not specifically ask the trial court for *retroactive relief*, it is therefore raising a new issue on appeal. But the legal issue of DMHC's obligation under the law prior to the ABA statute was raised before the trial court and is precisely the legal issue being raised here.

6

for relief was broad enough to encompass a request for reimbursement of ABA-related costs arising from claims which were filed by enrollees and improperly denied while this litigation was pending.

While DMHC took the position that the matter was indeed moot, it was apparent that, at the very least, a controversy remained regarding whether Healthy Families and PERS plans were required to cover ABA provided or supervised by unlicensed BACB-certified providers. We therefore tentatively indicated our belief that the appeal was not moot, set the case for oral argument on the merits, and permitted additional briefing.

The additional briefing followed, in which the parties again argued whether the law prior to the enactment of the ABA statute required licensure for the provision of ABA. This posed a very important but difficult issue, in which many entities had a strong interest, so the court requested amicus briefing. In our letter soliciting amicus briefing, we stated, "this court must determine whether the law prior to [the ABA statute] required the DMHC to order health care providers to provide ABA services which are determined to be medically necessary but are to be provided by practitioners who are unlicensed, but certified by the BACB." We received amicus briefs from organizations representing ABA practitioners, autism advocates, and the Department of Insurance, all discussing some aspect of this issue. To say that the parties and amici expended a great deal of time, money, and effort briefing this issue would be an understatement.[8]

---

[8]   That the parties sought judicial resolution of this dispute is clear. There is also evidence that the *Legislature* desired a judicial resolution of the dispute. At an Assembly Health Committee Hearing on Senate Bill 946, the bill which would become the ABA statute, Senator Steinberg, the author of the bill, stated, "this bill certainly has no intention to interfere with any existing litigation. Those cases should stand on their own." While Senator Steinberg indicated a personal belief that ABA therapy was required under then-current law, he recognized it was a matter of dispute. Senator Steinberg stated that there was no intent for the ABA statute to make any comment about whether ABA was required under then-existing law; the ABA statute was intended only to provide immediate coverage.

c.      *After Our Opinion, Reconsideration Was Sought, But No One*
        *Argued That The Issue Was Not Properly Before the Court*

This court then issued a unanimous opinion resolving the issue.  We concluded that the practice of ABA constituted the practice of medicine—specifically, the sub-practice of psychology—and that, prior to the enactment of the ABA statute, BACB-certified practitioners were necessarily engaging in the unlicensed practice of psychology.  We also concluded, however, that the enactment of the ABA statute constituted a legislative endorsement of BACB-certification as an equivalent of licensure, but only from July 1, 2012 forward.[9]

There followed the receipt of a petition for rehearing by Consumer Watchdog, and several requests for reconsideration by ABA practitioners.  After we granted the petition for rehearing, we accepted further amicus briefing.  While we received the input of the parties and many amici on the merits of our opinion, *not one* of them took the position that the issue of the need for licensure of ABA therapists was not before this court.  There were arguments that we should not have reached the specific issue of whether the practice of ABA constituted the practice of *psychology*, but no suggestion that we should limit our analysis to prospective issues only and therefore not address the state of the law *prior* to the effective date of the ABA statute.  Consumer Watchdog itself made no effort to argue that we should not address this issue, and, indeed, continued to assert that we should.  In the conclusion to its response to amicus briefing, Consumer Watchdog stated that we should modify our opinion "and issue a decision holding, *inter alia*, that even prior to [the ABA statute's] July 1, 2012, effective date, BACB-certified behavior analysts were not required to be licensed under the Business and Professions Code, and that DMHC violated its ministerial duty by improperly denying coverage for medically necessary ABA administered or supervised by unlicensed BACB-certified behavior analysts."

---

[9]     This statute, by its terms, expires on January 1, 2017, and therefore does not represent a final legislative resolution of this issue.

8

d.      *The Issue Was Raised*

The issue of whether the law as it existed prior to the ABA statute required DMHC to order coverage for ABA to be provided or supervised by BACB-certified behavior analysts even though they held no license of any kind was: (1) raised by Consumer Watchdog's petition; (2) fully litigated at trial, and before this court; and (3) never once argued, after our initial opinion was filed, to have been an issue improperly considered and resolved by this court. In short, the issue was clearly raised and should be addressed. My colleagues' refusal to recognize either the justiciable existence or significance of this important issue is an unfortunate abandonment of a principal appellate obligation: to consider and resolve the issues raised and presented by the parties. I now turn to how I believe this court should resolve that issue.

2.      *ABA Constitutes the Practice of Medicine*

Business and Professions Code section 2052, part of the Medical Practice Act (Bus. & Prof. Code, § 2000 et seq.), provides that "any person who practices or attempts to practice, or who advertises or holds himself or herself out as practicing, any system or mode of treating the sick or afflicted in this state, or who diagnoses, treats, operates for, or prescribes for any ailment, blemish, deformity, disease, disfigurement, disorder, injury, or other physical or mental condition of any person, without having at the time of so doing a valid, unrevoked, or unsuspended certificate as provided in this chapter or without being authorized to perform the act pursuant to a certificate obtained in accordance with some other provision of law is guilty of a [crime]."

This language is very broad, encompassing any person who "treats . . . any . . . physical or mental condition of any person." The Legislature has enacted several exemptions from the burden of this statute; the language of the exemptions, however, only serves to underline the breadth of the statute. These

9

exemptions include "the domestic administration of family remedies"[10] (Bus. & Prof. Code, § 2058, subd. (a)); the giving of nutritional advice (Bus. & Prof. Code, § 2068); "[t]esting and guidance programs in schools" (Bus. & Prof. Code, § 2062); medical students performing medical acts as part of their course of study (Bus. & Prof. Code, § 2064); and the limited practice of alternative and complementary healing arts services, if certain disclosures are made. (Bus. & Prof. Code, §§ 2053.5, 2053.6). Indeed, in enacting the latter statutes, governing the practice of alternative and complementary medicine, the Legislature made express findings and declarations stating, "Notwithstanding the widespread utilization of complementary and alternative medical services by Californians, the provision of many of these services may be in technical violation of the Medical Practice Act [citation]. Complementary and alternative health care practitioners could therefore be subject to fines, penalties, and the restriction of their practice under the Medical Practice Act even though there is no demonstration that their practices are harmful to the public. [¶] The Legislature intends, by enactment of this act, to allow access by California residents to complementary and alternative health care practitioners who are not providing services that require medical training and credentials. The Legislature further finds that these nonmedical complementary and alternative services do not pose a known risk to the health and safety of California residents, and that restricting access to those services due to technical violations of the Medical Practice Act is not warranted." (Stats. 2002, ch. 820, § 1, subds. (b) & (c).)

---

[10] In *Bowland v. Municipal Court* (1976) 18 Cal.3d 479, a defendant charged with the unlicensed practice of medicine argued that the statute was unconstitutionally vague, as it is unclear whether the statute forbids such conduct as "the statement by an unlicensed person to a friend that the friend sounds like he has a cold; the suggestion that a grief be assuaged by a long trip; or advice by an unlicensed person that one suffering from a cold administer to himself aspirin and orange juice." (*Id*. at p. 491.) Our Supreme Court did *not* hold that these hypotheticals do not constitute the practice of medicine. Instead, it suggested that "[i]nformal recommendation among friends as to the efficacy of nonprescription vitamin compounds or ocean cruises seems akin to sharing a 'family remedy,' " under the precursor statute to Business and Professions Code section 2058, subdivision (a). (*Bowland v. Municipal Court, supra,* 18 Cal.3d at p. 492.)

10

Case law also confirms the necessity of a broad interpretation of the practice of medicine. Business and Professions Code section 2052 "represents a reasonable exercise of the state police power, as the statute was designed to prevent the provision of medical treatment to residents of the state by persons who are inadequately trained or otherwise incompetent to provide such treatment, and who have not subjected themselves to the regulatory regime established by the Medical Practice Act [citation]. Causing or intending an injury is not an element of the offense . . . . " (*Hageseth v. Superior Court* (2007) 150 Cal.App.4th 1399, 1417.) "The state . . . clearly has a strong and demonstrable interest in protecting its citizens from persons who claim some expertise in the healing arts, but whose qualifications have not been established by the receipt of an appropriate certificate." (*Bowland v. Municipal Court, supra,* 18 Cal.3d at p. 494.) That the unlicensed practitioner may be competent is no defense. Our system, "in order to assure the protection of the public, requires that a person's competency be determined by the state and evidenced by a license." (*Magit v. Board of Medical Examiners* (1961) 57 Cal.2d 74, 85.)

It is apparent, then, that the "practice of medicine" is construed very broadly. However, although licensed physicians may practice medicine (Bus. & Prof. Code, § 2051), they are not the only individuals permitted to perform acts which may constitute the practice of medicine. As noted in Business and Professions Code section 2052, if the individual is "authorized to perform the act pursuant to a certificate obtained in accordance with some other provision of law," the act will not constitute the unlicensed practice of medicine. This is confirmed by Business and Professions Code section 2061, which provides, "Nothing in this chapter shall be construed as limiting the practice of other persons licensed, certified, or registered under any other provision of law relating to the healing arts when such person is engaged in his or her authorized and licensed practice."

11

Numerous such authorizations exist. For example, licensed dentists may practice dentistry (Bus. & Prof. Code, § 1600); licensed (registered) nurses may practice nursing (Bus. & Prof. Code, § 2732); licensed psychologists may practice psychology (Bus. & Prof. Code, § 2903); licensed chiropractors may practice chiropractic (Bus. & Prof. Code, § 1000-4); licensed occupational therapists may practice occupational therapy (Bus. & Prof. Code, § 2570.3); licensed physical therapists may practice physical therapy (Bus. & Prof. Code, § 2630); licensed respiratory care practitioners may practice respiratory care (Bus. & Prof. Code, § 3730); licensed speech-language pathologists and audiologists may practice speech-language pathology and audiology (Bus. & Prof. Code, § 2532); licensed acupuncturists may practice acupuncture (Bus. & Prof. Code, § 4937); licensed midwives may practice midwifery (Bus. & Prof. Code, § 2507); and certified dispensing opticians may fit and adjust spectacles and contact lenses (Bus. & Prof. Code, § 2553). Each of these practitioners is authorized to perform acts which constitute the practice of medicine, as limited by the scope of their own licenses.[11] In short, physicians have broad authority to practice medicine, while every other licensed health professional has a limited license to perform tasks which are within the scope of that license, which were previously within the exclusive province of physicians. (58 Ops. Cal. Atty. Gen. 186, 187 (1975).)

---

[11] Indeed, in some cases, the statutory scheme providing for the licensure of such professionals expressly states that they are not licensed to practice medicine beyond the practice of their specific healing art. (See, e.g., Bus. & Prof. Code, §§ 2530.4 [speech-language pathologists and audiologists]; 2621 [physical therapists]; 3705 [respiratory care practitioners].)

This case is concerned with the provision of ABA therapy.  It is DMHC's argument that it cannot direct plans to provide ABA therapy performed by unlicensed individuals, as to do so would be directing plans to pay for the unlicensed practice of medicine.  Given the broad definition of the practice of medicine discussed above, it is not possible to avoid the conclusion that the practice of ABA constitutes the practice of medicine.  Consumer Watchdog argues from the premise that ABA constitutes "medically necessary treatment" of autism, within the meaning of the MHPA.  But as a practice which attempts to "treat . . . [the] mental condition" of autism, it necessarily constitutes the practice of medicine.[12]

---

[12]     It should go without saying that policy reasons support a broad construction of Business and Professions Code section 2052 and its inclusion of the practice of ABA. ABA is an intensive behavioral therapy.  Front-line practitioners of ABA often spend 26 to 40 hours per week working with a single autistic child of tender years.  If performed correctly, ABA can create new brain connections in a child with autism. While this case is concerned with the provision of ABA by BACB-certified practitioners, and individuals supervised by BACB-certified practitioners, the prospect that individuals, with no training whatsoever, could offer themselves as ABA practitioners to the parents of autistic children is a matter of legitimate concern.  The BACB will not certify an individual as a Board Certified Behavior Analyst unless that person has a Master's degree in a related field, 225 hours of graduate coursework in behavior analysis, substantial supervised experience, and has passed an examination.  If ABA does not constitute the practice of medicine, there is nothing to stop untrained and uncertified individuals from calling themselves "Applied Behavior Analysts" and claiming that they can safely practice ABA.  It is not difficult to imagine that permanent harm could well result to a vulnerable autistic child by 40 hours per week of intensive behavior therapy provided by someone who is neither trained, tested, nor supervised.

13

There is some authority, however, suggesting that when an individual is engaging in the unlicensed practice of medicine, it is preferable to characterize the individual as engaging in the unlicensed practice of the particular specialty for which a license is required in order to perform the act in question. (See *People v. McCall* (2013) 214 Cal.App.4th 1006, 1010-1012.)[13] As such, it may be preferable to discuss the unlicensed performance of ABA as the unlicensed practice of the specialty of psychology, rather than simply as the unlicensed practice of medicine.

Business and Professions Code section 2903 prohibits the practice of psychology without a license. "The practice of psychology is defined as rendering or offering to render for a fee to individuals, groups, organizations or the public *any psychological service* including *the application of psychological* principles, *methods*, and procedures *of* understanding, predicting, and *influencing behavior, such as the principles pertaining to learning*, perception, motivation, emotions, and interpersonal relationships; *and the methods and procedures of* interviewing, counseling, psychotherapy, *behavior modification*, and hypnosis . . . . [¶] *The application of these principles and methods includes*, but is not restricted to:  diagnosis, prevention, *treatment*, and amelioration *of* psychological problems and emotional and *mental disorders* of individuals and groups." (Italics added.)

---

[13]    *People v. McCall* involved the prosecution of a midwifery *student* who, while unsupervised, provided prenatal care for a patient, and attended and assisted at a birth, manually guiding the baby out, cutting the umbilical cord, removing the placenta, giving the mother an injection to stop hemorrhaging, and suturing a tear.  The defendant argued that she should have been prosecuted for the misdemeanor of the unlicensed practice of midwifery, rather than felony unlicensed practice of medicine.  While the Court of Appeal acknowledged the general principle that a specific statute is considered an exception to the general one, it rejected the defendant's argument, stating that she "may have committed a misdemeanor violation of the Midwifery Act by performing midwife services without the required supervision of a licensed midwife or a physician and surgeon.  But she did a great deal more than that.  Her conduct above and beyond the failure to secure supervision constituted, as the jury found, practicing medicine without certification, a felony violation of the general statute." (*Id*. at p. 1016.)

14

ABA involves the application of psychological methods to influence behavior, and can be considered a form of behavior modification. When used as a treatment for autism, it therefore falls within the definition of psychology. As ABA falls solidly within the definition of psychology, its practice by an individual who is not licensed to practice psychology, or permitted to do so by another license, constitutes the unlicensed practice of psychology.[14]

Perhaps in an attempt to avoid the unintended consequence of arguing that BACB-certified practitioners are committing the unlicensed practice of medicine, DMHC makes the novel argument that ABA performed by BACB-certified practitioners is *educational*, while ABA performed by otherwise licensed individuals is *medical treatment*. In other words, DMHC argues that whether a practice constitutes a medical

---

[14] An exception to Business and Professions Code section 2903 provides that it shall not prevent "qualified members of other recognized professional groups licensed to practice in the State of California, such as, but not limited to, physicians, clinical social workers, educational psychologists, marriage and family therapists, optometrists, psychiatric technicians, or registered nurses, or attorneys admitted to the California State Bar, . . . or duly ordained members of the recognized clergy, or duly ordained religious practitioners from doing work of a psychological nature consistent with the laws governing their respective professions." (Bus. & Prof. Code, § 2908.) In response to our initial opinion in this case, we received amicus briefing from the California Association of Marriage and Family Therapists, the National Association of Social Workers, and the California Association for Licensed Professional Clinical Counselors, all requesting that we modify our original opinion to confirm that their members could legally practice ABA. Business and Professions Code section 2908 specifically provides that "qualified members of other recognized professional groups licensed to practice in the State of California," including but not limited to clinical social workers and marriage and family therapists may, in fact, "do work of a psychological nature consistent with the laws governing their respective professions." It is beyond the scope of this opinion to determine *which* "recognized professional groups licensed to practice" in California may perform ABA "consistent with the laws governing their respective professions." I simply wish to note that, when I conclude that the practice of ABA constitutes the practice of psychology, this does not mean that I believe that only licensed doctors and psychologists can perform ABA. *Any* licensed professional whose license permits it may practice ABA.

15

treatment depends on the identity of the individual performing the practice. The conclusion finds no support in law or logic.

There are some acts which may be medical or non-medical depending on the circumstances in which they are performed. Hypnosis, for example, may be used for the purposes of entertainment or self-improvement; it only becomes the practice of psychology when it is used as a method of diagnosis or treatment. (Bus. & Prof. Code, § 2908 [exempting from the prohibition on the unlicensed practice of psychology "persons utilizing hypnotic techniques which offer avocational or vocational self-improvement and do not offer therapy for emotional or mental disorders"];[15] see also 54 Ops. Cal. Atty. Gen. 62 (1971).) Massage for the purposes of relaxation does not constitute the practice of medicine (*In re Maki* (1943) 56 Cal.App.2d 635, 644); massage when used to "cure or relieve a certain . . . ailment" is the practice of medicine. (*People v. Cantor* (1961) 198 Cal.App.2d Supp. 843, 848.) In each instance, the focus is on the goal of the act – whether it is performed for a medical purpose – not on the identity of the individual performing it. The conclusion makes logical sense. An appendectomy is a medical practice whether performed by a doctor or a short order cook. Similarly, frying an egg would not be transformed into a medical practice if performed by a licensed physician. It is the act itself which is the focus of the inquiry, not the actor. (Cf. *Board of Medical Quality Assurance v. Andrews* (1989) 211 Cal.App.3d 1346, 1348, 1358 [acts performed by the "Religious School of Natural Hygiene" and its "first minister" indisputably constituted the practice of medicine].)

Thus, while I appreciate DMHC's concern that its argument that ABA constitutes the practice of medicine may, in fact, prove too much (as DMHC has no interest in affecting the practice of ABA outside the context of when an HMO is requested to cover it), the argument is, in fact, correct. The practice of ABA constitutes the practice of medicine, specifically, the practice of psychology. It follows that, prior to the

---

[15] The statute also permits hypnosis for medical purposes by a non-psychologist, if the hypnotist does so by referral from a licensed doctor, dentist, or psychologist. (Bus. & Prof. Code, § 2908.)

effective date of the ABA statute, BACB-certified therapists were engaging in the unlicensed practice of medicine or psychology. Thus, the DMHC's refusal to order plans to provide coverage for ABA therapy performed prior to July 1, 2012 was entirely correct.

I agree with the majority that the enactment of the ABA statute constitutes effective licensure of BACB-certified individuals[16] and that, therefore, even plans excluded from the scope of the ABA statute (Healthy Families and PERS) can no longer (i.e., after July 1, 2012) deny coverage on the ground that ABA provided or supervised by BACB-certified practitioners constitutes the unlicensed practice of medicine or psychology. However, prior to the effective date of the ABA statute, practitioners of ABA who did not hold a license which permitted them to practice ABA were clearly engaging in the unlicensed practice of psychology (an undisputed sub-practice of the practice of medicine). Thus, DMHC cannot be considered to have had a ministerial duty to direct any health plan under its jurisdiction to provide coverage to plan enrollees for such therapy prior to July 1, 2012.

---

[16] Consumer Watchdog argues that certain statutes and regulations existing prior to the ABA statute constituted effective licensure of BACB-certified individuals. Specifically, it relies on a provision of the Education Code providing that "[a] person recognized by the [BACB] as a Board Certified Behavior Analyst may conduct behavior assessments and provide behavioral intervention services for individuals with exceptional needs." As there is nothing in the statutory scheme defining "behavioral intervention services" to include the provision of ABA to autistic children, this provision is of little aid to Consumer Watchdog. Consumer Watchdog also notes that BACB-certified individuals have been reimbursed by regional centers, under Department of Developmental Services Regulations which allow BACB-certified vendors to be classified as Behavior Analysts. (Cal. Code Regs., tit. 17, § 54342.) A regulation allowing reimbursement, however, is not a statutory exception to licensure.

17

However, due to the majority's construction of Consumer Watchdog's petition as seeking only relief that is prospective from the date of the final resolution of this action, any relief will apply only to grievances filed on behalf of autistic enrollees in Healthy Families and PERS plans *after* this litigation is finally resolved and a writ has issued. As I believe the issue of whether DMHC was required to order plans to provide coverage for ABA provided or supervised by BACB-certified practitioners *from the date of the filing of the petition* is properly before this court, I would grant such relief for autistic children in Healthy Families and PERS plans with respect to any grievance filed for ABA which was to be provided or supervised by BACB-certified practitioners *from the July 1, 2012 effective date of the ABA statute onward.* For that reason, I concur in part and dissent in part.

CROSKEY, J.

18